**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HENRY WENDELL LAFRAMBOISE,**

                    **Plaintiff,**

          **v.**                                    **Civil Action No.**
                                                    **7:11-CV-01214 (NAM)**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

                    **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

FOR PLAINTIFF:

CONBOY, McKAY LAW FIRM                         LAWRENCE HASSELER, ESQ.
307 State Street
Carthage, NY 13619

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN                      TOMASINA DiGRIGOLI, ESQ.
United States Attorney for the                 Special Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

OFFICE OF REG'L GEN. COUNSEL                   STEPHEN P. CONTE, ESQ.
Social Security Administration                 Chief Counsel
26 Federal Plaza
New York, NY 10278

**NORMAN A. MORDUE, U.S. DISTRICT JUDGE:**

**MEMORANDUM-DECISION AND ORDER**

          Plaintiff Henry Wendell Laframboise has commenced this action pursuant to 42 U.S.C. §

405(g), seeking review of an administrative determination denying his application for

supplemental security income ("SSI") under the Social Security Act.  Plaintiff argues that the agency's finding that he was not disabled at any relevant time, and thus not entitled to receive SSI benefits, resulted from a failure to apply proper legal principles and is not supported by substantial administrative record evidence.  Specifically, he argues that, in arriving at his determination of no disability, the assigned administrative law judge ("ALJ") erred by (1) overlooking his lower back condition, carpal tunnel syndrome ("CTS") and knee pain, all of which allegedly limit his ability to perform work-related functions; (2) failing to consider opinions from his treating physicians that contradict the ALJ's findings regarding plaintiff's residual functional capacity ("RFC"); (3) improperly substituting his opinions for those of appropriate medical sources; and (4) improperly refusing to reopen the record and solicit additional information concerning his medical condition.

Having carefully reviewed the administrative record and the parties' arguments in this matter, and applying the requisite deferential standard, the Court concludes that, in finding that plaintiff was not disabled, the ALJ failed to consider the limiting effects of plaintiff's back condition upon his ability to perform work functions, and improperly rejected opinions of plaintiff's treating physician.  Accordingly, the Court concludes that the Commissioner's determination should be reversed, and the matter remanded to the agency for further findings.

I.      **BACKGROUND**

Plaintiff was born in June 1969; at the time of the administrative hearing in this matter, held on March 22, 2010, he was forty years old.  Administrative Transcript at 42, 105.  Plaintiff is not married, and lives with one or more other individuals in Gouverneur, New York.  AT 54, 57, 105-06, 123.  Plaintiff left school at the age of fifteen while in the eighth grade, and has not

achieved either a high school degree or an equivalency diploma since then.  AT 48-50, 122.

Plaintiff is able to, and occasionally does, drive although he does not possess a driver's license.

AT 57-58.  Plaintiff smokes approximately one pack of cigarettes per day, and has a history of

using illegal drugs, including cocaine and marijuana.  AT 397, 404, 434.  Despite strong

recommendations from treating sources, he has been unable to abstain from smoking cigarettes.

AT 514-21, 524.

Plaintiff last worked at a fast food restaurant between November 2006, and July 15, 2007.

AT 43, 118, 136.  Plaintiff left that position in order to move to New York.  AT 117.  Prior to

that time, he worked for several years as a casual painter, a construction laborer, a tree trimmer,

in a warehouse forming neck braces, and as a dishwasher.  AT 44, 118, 136.

Plaintiff has suffered from the effects of a serious heart condition, dating as far back as

2006 and early 2007, when he presented on three separate occasions to the emergency

department of the Middle Tennessee Medical Center, each time later leaving the facility against

medical advice and refusing to accept recommendations concerning further treatment.  See AT

213-53.  Upon his return to New York in 2007, plaintiff resumed treatments for his heart

condition and other medical needs with the Antwerp Health Clinic, affiliated with E.J. Noble

Hospital, located in Antwerp, New York, where he reported to health care professionals that he

suffers from heart problems, depression, pneumonia, abdominal pain, back and knee pain, and

numbness and tingling in his fingers.  AT 414-32, 884-98.  Plaintiff's care at the Antwerp Health

Clinic was overseen principally by David Vigeant, a physician assistant ("PA"), under the

supervision of Dr. Gerald Calabrese.  *Id*.

Plaintiff has also been seen at the New York Heart Center, located in Gouverneur, New

York, where he was treated from August 28, 2007, through November 22, 2012 for his heart condition.  AT 433-78, 480-83, 501-06, 521-29.  Cardiac catheterization performed at Crouse Hospital, in Syracuse, New York, on November 8, 2007, disclosed that plaintiff suffered from three-vessel coronary artery disease, with a totally occluded left anterior descending artery ("LAD") and right coronary artery ("RCA"), and moderate left ventricular ("LV") dysfunction. AT 473-74, 322-23.  Based upon those findings, plaintiff underwent triple bypass surgery, performed by Dr. Charles Lutz on December 14, 2007.  AT 50, 322-23.

Following his coronary surgery, plaintiff developed pains in his chest, described by him as "feeling the wires" through his skin every now and then.  AT 50, 316.  Based upon his complaints, plaintiff was examined by Dr. Lutz, who noted that he could palpate the wires on physical examination, but did not find any obvious surgical cause for his pain.  AT 316.  Plaintiff was referred to Dr. Donna-Ann M. Thomas, of the Upstate Medical University Hospital Pain Center, where he was seen on several occasions and various treatment options were explored, including a recommendation that Dr. Lutz consider removing the offending sternal wire.  AT 396-405.  Plaintiff has been prescribed several medications for his pain and other symptoms, including Paxil, Zoloft, Crestor, Oxycotin, Oxycodone, Movic, Lisinopril, Lyrica, Lydoderm, Naproxen, Nitroglycerin, Nitroquick, and Tramadol.  AT 122, 255, 316, 318-20, 420, 490-93, 499-500, 521, 525.

Prior to his incapacitating heart illness, plaintiff was active, and could walk up to three hours at a time, paint houses, seal driveways, remodel homes, mow lawns, ride a bicycle, hike, climb trees, tear down garages, and work up to twelve hours each day.  AT 145.  Despite his medical conditions, plaintiff is still able to bathe and dress himself.  AT 58.  In addition, plaintiff

cooks, sometimes drives, watches movies, plays video games, and takes out the dog.  AT 57-58, 62, 148.

## II.    PROCEDURAL HISTORY

### A.    Proceedings Before the Agency

Plaintiff filed an application for SSI benefits on or about August 13, 2007, claiming a disability onset date of April 1, 2007.  AT 105-07.  Following a series of internal procedural developments at the agency level, a hearing was held on March 22, 2010, before ALJ Thomas P. Tielens, to address plaintiff's claim for benefits.  AT 39-65.

On April 27, 2010, ALJ Tielens issued a written decision in which, after conducting the required de novo review of the available record evidence, he determined that plaintiff was not disabled at any relevant time and therefore not entitled to receive SSI benefits.  AT 21.  In arriving at that determination the ALJ applied the now-familiar, five-step test for determining disability, concluding, at step one, that plaintiff did not engage in substantial gainful activity after his application date of August 13, 2007, though noting that, by his own account, Laframboise had worked until July 2007, a point in time later than his claimed disability onset date by approximately three months.  AT 14.  The ALJ next determined that plaintiff suffers from a severe impairment that significantly limits his ability to perform work-related functions, specifically "coronary artery disease, history of myocardial infarctions and status post triple bypass surgery," but concluded that the condition does not meet or medically equal any of the listed, presumptively disabling impairments set forth in the Commissioner's regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 14-16.  In arriving at that determination, ALJ Tielens rejected plaintiff's knee, back, and neck pain, CTS, and mental condition as presenting

limitations sufficient to qualify as severe at step two of the disability analysis.

Before turning to step four of the analysis, ALJ Tielens reviewed the available medical evidence and concluded that, despite his medical condition, plaintiff retains the residual functional capacity ("RFC") to lift and/or carry more than 10 pounds occasionally, sit for at least six hours in an eight hour day, and stand and/or walk for at least two hours in an eight hour day. AT 16. After making this finding, the ALJ noted that it was consistent with the plaintiff's ability to perform "more than [sic] full range of sedentary work as defined [in the controlling regulations]." AT 16. In arriving at that determination, the ALJ considered plaintiff's subjective testimony regarding his symptoms and, while concluding that he suffers from medically determinable impairments that could reasonably be expected to cause some of the symptoms alleged, he rejected the plaintiff's statements concerning the extent of those symptoms as not entirely credible. AT 17.

Having determined plaintiff's RFC, the ALJ next applied that finding to plaintiff's past relevant work as a painter, construction laborer, tree trimmer, dishwasher, and cleaner in a fast food restaurant, concluding that each of those jobs require the ability to perform at exertional levels greater than plaintiff's RFC, and that he therefore is unable to perform any of his past relevant work. AT 20. The ALJ then turned to the grids at step five of the analysis, and, when applying plaintiff's relevant characteristics and his RFC finding, concluded that a finding of "not disabled" was directed by Rule 201.24. AT 20.

The ALJ's opinion became a final determination of the agency on August 26, 2011, the date on which the Social Security Administration Appeals Council denied plaintiff's request for review of that decision. AT 1-3.

6

### B.      This Action

Plaintiff commenced this action on October 11, 2011.  Dkt. No. 1.  Issue was thereafter joined by the filing of an answer on behalf of the Commissioner on January 23, 2012, accompanied by an administrative transcript of the evidence and proceedings before the agency at the time its determination was made.  AT 8, 9.  With the filing of plaintiff's brief on March 26, 2012, and the Commissioner's brief on May 10, 2012, the matter is now ripe for determination.

## III.   DISCUSSION

### A.      Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. §

405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S. Ct. at 217); *Martone*, 70 F. Supp. 2d at 148 (quoting *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1420).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of Section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).

8

Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *See Parker*, 626 F.2d at 235; *see also Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

### B.      Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. at § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id*. at §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.

*Id*. at §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id*. at §§ 404.1520(d), 416.920(d), Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Id*. at §§ 404.1520(d), 416.920(d); *see also Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter, the agency must examine whether the claimant can do any other work.  *Id*. at §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Burgess v. Astrue*, 537 F.3d 117, 118 (2d Cir. 2008); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Burgess*, 77 F.3d at 118; *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

## C.     The Evidence in This Case

In support of his challenge to the Commissioner's determination, plaintiff argues that (1) the ALJ failed to recognize physical ailments other than those related to his heart, including low back pain, CTS, and knee pain, as severe for purposes of his step two analysis; (2) the ALJ's findings resulted from improper evaluation and ill-explained rejection of opinions of his primary treating physician and PA; (3) the ALJ's RFC determination is not supported by substantial

evidence and represents the substitution of his opinions for the judgments of competent medical professionals; and (4) the record is incomplete, and should have been more fully developed by the ALJ.

### 1.    Step Two Analysis

While ALJ Tielens recognized plaintiff's cardiac condition as qualifying as severe at step two of his analysis, he rejected his lower back and knee pain, as well as his CTS, as severe impairments significantly restricting his ability to perform basic work activities.  Plaintiff contends that this failure constituted error on the ALJ's part.

The governing regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  That section goes on to describe what is meant by the phrase "basic work activities," defining the term to include "the abilities and aptitudes necessary to do most jobs."  *Id*. at § 404.1521(b).

As plaintiff has argued, the second step requirement is de minimis, and intended only to screen out the truly weakest of cases.  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Baneky v. Apfel*, 997 F. Supp. 543, 545-46 (S.D.N.Y. 1998).  The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or an impairment," however, is not, by itself, sufficient to establish a condition as severe.  *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

It should also be noted that an ALJ is not required to comment on every non-severe impairment at step two of the analysis and may, under certain circumstances, continue through the remaining steps without doing so.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007);

11

*Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987); *Cook v. Astrue*, No. 08-CV-1351, 2011 WL 2490996, at *4 (W.D.N.Y. May 24, 2011), report and recommendation adopted by, 2011 WL 2471300 (W.D.N.Y. June 22, 2011).  A decision is vulnerable to challenge when the ALJ improperly omits an impairment at the second step only when he also fails to consider the limiting effects of that impairment in the succeeding steps resulting in a decision that lacks substantial support in the record.  *See Resendes v. Astrue*, 780 F. Supp. 2d 125, 137 (D. Mass. 2011) (holding that the ALJ's mere implication that a plaintiff's headaches imposed no limitations was not sufficiently clear); *Cobbins v. Comm'r of Soc. Sec.*, No. 09-CV-1305, 2012 WL 966072, at *4 (N.D.N.Y. Mar. 1, 2012) (Bianchini, M.J.), report and recommendation adopted by 2012 WL 960939 (N.D.N.Y. Mar. 21, 2012) (Scullin, J.) (finding no reversible error where non-severe impairments were not considered at step two but were factored into the ALJ's subsequent evaluation).

### a.    Carpal Tunnel Syndrome

At the hearing, plaintiff testified concerning the effects of his wrist and hand conditions, noting that he first experienced them "a couple of years" prior to the hearing, and began dropping things "every now and then," going on to testify that the dropping occurs between one to two times monthly.  AT 53-54.  Plaintiff also testified that he occasionally wears braces prescribed by Dr. George Mina for those conditions.  AT 54.

In January 2010, plaintiff was referred by Dr. Mina to Claxton-Hepburn Medical Center for a nerve conduction study of his upper extremities.  AT 490-91.  That referral was made based upon a visit on December 9, 2009, during which plaintiff complained of pain in both wrists and numbness in his fingers – conditions that were progressively worsening and causing him to

sometimes drop objects.  AT 510.  At that time, he reported that, "for a few years," he had been experiencing intermittent numbness and tingling in his finger tips, progressing into pain in all of the fingers of both hands.  *Id.*  The nerve conduction study showed that the plaintiff exhibited "very mild signs of compression of the median nerve at or about the wrist bilaterally involving the sensory component."  AT 491.  A physical examination associated with that study revealed no significant muscle atrophy in plaintiff's upper extremities, with normal muscle strength at 5/5 in both upper extremities except for the abductor pollicis, which was determined to be 3+/5 bilaterally.  AT 490-93.

The results of the January 2010 testing support the ALJ's rejection of CTS, a condition which plaintiff did not mention in his disability report, as sufficiently severe to qualify at step two of the disability analysis.  *See* AT 117.  Because that testing revealed that plaintiff retains significant use of both hands despite suffering from a mild case of CTS, the ALJ's determination in this regard was proper.

### b.    Back Condition

During the hearing, plaintiff testified that he has experienced back problems "pretty much all [his] life," although they have worsened with age.  AT 53.  He testified to being in constant pain, requiring the use of a TENS unit, and that he attends physical therapy three times per week to address the condition.  AT 56, 500.

Aside from a reference to low back pain in a medical source statement from Dr. Gerald Calabrese, dated March 2010, AT 494-98, there is only a modest amount of medical evidence in the record to support a finding that plaintiff's back condition limits his ability to perform work functions.  The overwhelming portion of plaintiff's medical records relate to his heart condition,

with little or no mention of lower back pain.  Significantly, on April 27, 2009, when visiting Dr. Mina, an orthopedist, plaintiff complained only of right knee pain, with no mention of his lower back.  AT 479.

X-rays, taken of plaintiff's lumbar spine on January 10, 2006, revealed only mild arthritic changes of the vertebral bodies at L3, L4, and to a lesser extent, L1.  AT 216.  Those x-rays disclosed no compressions or subluxations, and that the disc spaces are maintained, with no evidence of spondylolysis noted.  *Id*.

Plaintiff underwent physical therapy treatment for his lower back pain with Stephen R. Booth at E.J. Noble Hospital in Gouverneur, New York, beginning in March 2010.  AT 499-500. During the course of treatment, plaintiff attributed the condition to a dirt bike accident occurring several years prior, and described his discomfort as being as high as ten on the scale of ten, with Tramadol being taken to address his discomfort. AT 499.  Flexion and extension testing resulted in discomfort.  *Id*.  Treatment goals were identified as including the ability to sit for at least forty-five minutes and to walk for fifteen minutes, with moist heat and ultrasound prescribed to accomplish those goals.  AT 499-500.

Notwithstanding the scarcity of evidence revealing medical treatment for plaintiff's back condition, the court cannot overlook the medical source statement provided by Dr. Calabrese, his treating physician, on March 18, 2010, in which he opines that the back condition does restrict plaintiff's ability to lift, carry, stand, sit and walk, in addition to presenting postural limitations. AT 494-97.  That statement reflects lifting and carrying restrictions more limiting than in the RFC finding of the ALJ, suggesting what could be regarded as significant restrictions on basic work activities.  Dr. Calebrese attributes those limitations principally to both plaintiff's

14

post-surgery heart condition and his low back pain.  *Id.*

The treating source assessment form, together with the notes of Physical Therapist Stephen R. Booth, show that plaintiff's back condition does potentially present significant limitations upon his ability to perform work-related functions.  The ALJ's rejection of that condition of step two of the five step analysis was therefore an error.  Whether this error was carried over into the ALJ's RFC finding, providing a basis to vacate the Commissioner's determination, will be addressed below.

### c.     Knee

At his hearing, plaintiff also testified to experiencing a right knee problem that causes him to fall periodically.  AT 55-56.  According to the plaintiff, when he stands he must hold on to something in light of his knee condition.  AT 61.

On April 27, 2009, x-rays were taken of plaintiff's right knee.  AT 479.  Those x-rays revealed "some calcification tibial tubercle at the insertion of the patellar tendon."  *Id.*  Plaintiff was diagnosed as suffering from "Old Osgood-Schlatter Disease with prominence of the tibial tubercle right knee," and was advised to avoid kneeling or bumping the knee and that a "knee brace might help."  *Id.*  Motrin was recommended for relief of the pain associated with the condition.  *Id.*  When plaintiff saw PA Vigeant in March 2010, he mentioned the knee condition.  AT 499.  PA Vigeant noted that there was no diagnosis associated with the condition, and that it appeared to be "an internal de-rangement-type problem ."  *Id.*  PA Vigeant discerned "[s]ome creaking sensation" upon palpation of the right knee but "no laxity of the knee or any apparent injury with some basic orthopedic testing."  *Id.*  No steps were taken during that or the ensuing physical therapy to address the knee issue.  AT 499-500.

Based upon this minimal medical evidence regarding the knee condition, the court finds that the ALJ properly rejected it as not sufficiently severe to qualify as a recognized impairment at step two of the disability analysis.

### 2.    Treating Sources

The medical assessment form prepared by PA Vigeat and Dr. Calabrese regarding plaintiff's work-related capabilities reflects limitations that are significantly more restrictive than those acknowledged in the ALJ's RFC finding.  AT 494-98.  ALJ Tielens afforded that statement "little evidentiary weight," explaining that the opinions appear to be based upon conditions such as a back impairment, hearing loss, and CTS that are not supported by medical evidence in the record as limiting plaintiff's ability to perform work functions.  AT 19.  ALJ Tielens also noted a statement from plaintiff's treating cardiologist, Dr. Charles Lutz, in which he reported that plaintiff's pain complaints were disproportionate to any objective physical findings.  AT 19, 316, 318.  Plaintiff asserts that the ALJ failed to properly apply the treating source rule in rejecting those opinions.

"With respect to the nature and severity of [a claimant's] impairment(s), the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  *Burgess*, 537 F.3d at 128 (internal quotations and alterations in original, citations omitted).  "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"  *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Veino*, 312 F.3d at 588.  Where conflicts arise in

16

the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner. *Veino*, 312 F.3d at 588.

If the ALJ does not give controlling weight to a treating source's opinion, he must apply several factors to determine what degree of weight should be assigned to the opinion, including (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the medical source has supported his or her opinion, (4) the degree of consistency between the opinion and the record as a whole, (5) whether the opinion is given by a specialist, and (6) other evidence which may be brought to the attention of the ALJ.  20 C.F.R. §§ 404.1527, 416.927.   In addition, if the ALJ chooses to reject a treating physician's opinions, he must provide his reasons for doing so.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ's failure to apply these legal standards when considering a treating physician's opinions constitutes a proper basis for reversal of an ALJ's determination. *Johnson*, 817 F.2d at  986; *Barnett*, 13 F. Supp. 2d at 316-17.

Here, the ALJ's rejection of the opinions of Dr. Calabrese and PA Vigeant is neither properly explained nor well-supported.  In his decision, ALJ Tielens gives short shrift to the assessment form of Dr. Calebrese and PA Vigeant, provided on March 18, 2010, finding the record to be lacking in objective evidence as it relates to plaintiff's back condition despite the fact that there is no indication in the record that Dr. Calebrese ever treated the claimant for that condition, and noting that plaintiff's cardiologist, Dr. Lutz, stated no opinion concerning his back condition and any resulting limitations.  AT 19.  The fact remains, however, that the record does contain notes of visits by the plaintiff to PA Vigeant, who apparently works together with Dr. Calebrese, periodically between February 23, 2010 and October 15, 2010.  AT 514-19.  It is true

that the record contains little objective evidence to support the extent of plaintiff's lower back condition reflected in the assessment form. No magnetic resonance imaging ("MRI") testing is revealed in the record, and the only x-rays of plaintiff's back, as was previously noted, were taken in 2006 and reveal exceedingly modest findings. AT 216. Nonetheless, the records of PA Vigeant reference ongoing complaints of back pain, for which plaintiff has undergone physical therapy, addressing the pain associated with the condition through use of a TENS unit and prescription medication. These facts, in combination with the inadequate explanation of the ALJ as to his reasons for rejecting the opinions of plaintiff's treating physician, demonstrate that the error committed at step two has also infected ALJ's RFC finding, and, consequently, his ultimate finding of no disability. The court therefore concludes that the matter should be remanded based upon the ALJ's failure in this regard.

### 3.      The ALJ's RFC Finding

Plaintiff next argues that the ALJ's RFC finding, to the effect that he is able to perform more than a full range of sedentary work, is not supported by substantial evidence.

A claimant's RFC represents a finding of the range of tasks he is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id.*; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including

18

impairments that result in postural and manipulative limitations, must also be considered.  20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions that the claimant is capable of performing; conclusory statements concerning his capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

The record reveals that, prior to undergoing by-pass surgery, plaintiff's primary medical condition of concern was his coronary condition.  The evidence reflects that in May and September of 2006, and again in January of 2007, he presented at emergency rooms for possible myocardial infarction, each time refusing recommended treatment and leaving the emergency room against medical advice.  AT 219-24, 225-35, 236-53.  Despite those events, plaintiff continued to work until July 2007.  AT 118.  Plaintiff's medical records further reveal that, following his coronary bypass surgery in December 2007, he recovered to a point where he is no longer limited by that condition in performing work-related functions.  AT 374, 451-53, 457-58; *but see* AT 494-98.

The ALJ's RFC findings, as they relate to the effects of that condition, are fully supported by the assessment of multiple consultants.  It is true that on November 2, 2007, Dr. R. Blaber, a State Agency Medical Consultant, reviewed the plaintiff's medical records and found that he was capable of lifting only ten pounds occasionally and less than ten pounds frequently, and of sitting

for six hours, standing and walking for two hours in an eight hour work day, and additionally should be restricted from heights and moving machinery.  AT 287-88.  That assessment, however, pre-dated plaintiff's coronary by-pass surgery.

Other opinions in the record similarly pre-date plaintiff's heart surgery.  On July 30, 2007, PA Vigeant, without rendering a function-by-function analysis, concluded that plaintiff "is not capable of working at this time."  AT 276-77.  The condition of concern, as expressed by PA Vigeant in that assessment, was plaintiff's coronary condition, the document closing with a comment, "needs clearance by cardiologist before returns to work."  AT 277.  Similarly, on August 28, 2007, Dr. Tech Slezka of the St. Lawrence County Department of Social Services, concluded that plaintiff was not capable of working, again without performing a function-by-function analysis, and relying exclusively upon plaintiff's coronary condition.  AT 281-82.

The medical evidence in the record reflects marked improvement in plaintiff's ability to perform work-related functions following his coronary surgery.  On March 14, 2008, Dr. A. Auerbach, another medical consultant, reviewed the available medical evidence, including post-surgical test results, and noted that plaintiff's stress test from March 6, 2008, "was negative to 13 METs, and ejection fraction was 46%."  AT 374-75, 457-58.  Dr. Auerbach therefore concluded that plaintiff is capable of lifting fifty pounds occasionally and twenty-five pounds frequently, and of standing, walking and sitting for six hours in an eight hour work day.  AT 374.  It was proper for the ALJ to rely upon that report of Dr. Auerbach whose opinions, even as a non-examining consultant, can provide support an RFC determination so long as they are consistent with substantial evidence in the record.  *See Buonara v. Comm'r of Soc. Sec.*, No.

05-Cv-1133, 2008 WL 2185349, at *8 (N.D.N.Y. May 23, 2008) (Scullin, J.).

The remedying of plaintiff's coronary condition, through bypass surgery, however, did not alleviate plaintiff's painful back condition. The records reflect that he continued to treat with medical professionals, including PA Vigeant, and to receive physical therapy, for that condition. A medical assessment form signed by Dr. Calebrese and PA Vigeant, one that the Court has already found was improperly rejected, reveals the opinion of those treating sources that, even following his heart surgery, severe limitations on plaintiff's ability to perform work-related functions persist. In light of the Court's finding that the medical assessment form prepared by those two individuals was improperly rejected, the Court concludes that the ALJ's RFC finding, made after rejecting the opinions explained in that form, cannot withstand judicial scrutiny. Accordingly, the Commissioner's finding of no disability, which is based upon the application of the flawed RFC finding to the grids, must be reversed.

**4.      Development of the Record**

In his last point, plaintiff questions the completeness of the record upon which the ALJ's decision was based, arguing that there were gaps that the ALJ was required to fill, before deciding the matter.

By statute, an ALJ is under an obligation to not only to develop a claimant's complete medical history for at least twelve months prior to the filing of an application for benefits, "but also to gather such information for a longer period if there [is] reason to believe that the information [is] necessary to reach a decision." *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) (citing 42 U.S.C. § 423(d)(5)(B) as incorporated by 42 U.S.C. § 1382c(a)(3)(G) and 20 C.F.R. § 416.912(d)). This affirmative duty imposed upon an ALJ to fully develop an

21

administrative record is not without limits, however, and is heavily dependent upon the circumstances of the case at hand. *Miller*, 2012 WL 3061949, at *3 (citing *Guile v. Barnhart*, No. 07-CV-0259, 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010) (Sharpe, J.)). The duty to re-contact treating medical sources in order to fully develop a record arises only when the ALJ cannot decide the issue of disability based upon the existing evidence. *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 47-48 (2d Cir. 1996)). When no obvious gaps exist in the administrative record, there is no affirmative obligation to seek additional information. *Rosa*, 168 F.3d at 79, n.5; *see also Miller*, 2012 WL 3061949, at *3.

Here, plaintiff does not cite to any particular gaps in the record. Instead, he suggests that the ALJ should have reached out to arrange for a consultative examination in order to properly assess his RFC. It is true that the Commissioner's regulations permit the agency to arrange for a consultative examination when the available evidence is not sufficient to support a decision on an individual's claim. 20 C.F.R. § 416.919a(b); *see also Hall ex rel. M.M. v. Astrue*, No. 11-CV-6317, 2012 WL 2120613, at *4 (W.D.N.Y. June 11, 2012). When deciding whether to order such an examination, the agency "has wide discretion." *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997) (citing *Diaz v. Sec'y*, 898 F.2d 774, 778 (10th Cir. 1990)).

Having carefully reviewed the record, the Court finds that, in light of the statements from plaintiff's treating sources concerning his back condition, and the lack of significant other medical evidence in the record addressing that condition, the ALJ should have requested a consultative examination in order to properly assess plaintiff's RFC.

**IV.    SUMMARY AND CONCLUSION**

It is quite apparent that, when addressing plaintiff's claim for benefits, the ALJ confined

his focus primarily to plaintiff's coronary condition which, following by-pass surgery, and with the exception of some residual sternum pain, appears to have resolved.  In doing so, the ALJ overlooked a significant back condition for which plaintiff has received treatment, physical therapy, and pain medication, and which plaintiff's treating physician has opined does significantly limit his ability to perform work-related functions.  The ALJ's rejection of the treating source statements in that regard are not well-explained, nor are they supported by substantial evidence.

In this instance, the court finds that the ALJ should have found, at step two, that plaintiff's back condition does significantly restrict his ability to perform work-related functions, and when arriving at his RFC assessment, should have found that it presents significant work-related limitations that were not considered.  The ALJ also should have discerned a need for more information concerning plaintiff's back condition, and should have exercised his discretion to order consultative examination before making a disability determination in this case.  For all of these reasons, it is hereby

ORDERED, that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability VACATED, and the matter REMANDED to the Commissioner for further proceedings consistent with this opinion; and it is further hereby

ORDERED that the clerk of the court serve a copy of this memorandum-decision and order upon the parties in accordance with this court's local rules.

Dated: March14, 2013
        Syracuse, New York

Honorable Norman A. Mordue
U.S. District Judge

23